[No. 29764. *En Banc.* May 31, 1946.]

CATHERINE KERR, *Respondent*, v. LEVI H. FLOYD *et al.*, *Appellants.*[1]

[1]Reported in 169 P. (2d) 349.

136

*Skeel, McKelvy, Henke, Evenson & Uhlmann,* for appellants.

*Sam L. Levinson,* for respondent.

BLAKE, J.—Plaintiff brought this action to recover damages for personal injuries she sustained in a collision with an automobile while walking across First avenue south at the intersection of Atlantic street, in Seattle. She was proceeding east on the north crosswalk of Atlantic street. The automobile, driven by defendant Levi H. Floyd, was going south on First avenue. Upon issues joined on negligence and contributory negligence, the cause went to trial before the court without a jury. The court made findings favorable to plaintiff and entered judgment for her in the sum of seventy-five hundred dollars. Defendants appeal.

The questions on appeal are whether the evidence preponderates against the findings upon (1) the issue of negli-

gence; (2) upon the issue of contributory negligence; and (3) as to the amount of damages.

Respondent's version of the accident is as follows:

"Q. What side of Atlantic Street did you go that time? A. On the northwest corner? Q. That is when you got to First Avenue? A. Yes. Q. In your own words tell the Judge what happened as you crossed the street. A. Well, when I got to the corner I looked to the left and the traffic was stopped and the green light was on. Q. Which way? A. In my favor. Q. For east-west traffic? A. Yes. Q. Were there any cars parked at the curb? A. Well, not near the crosswalk there was not but there was either a truck or a bus first and he came at me—

"The Court: I understand you to say there were no cars parked right at the crosswalk? A. Not parked but they were waiting to go south. He came from either the second or the third lane. He came and hit me. I should say the third lane,—the car that hit me.

"Q. How was the signal when you walked in the street? A. Green in my favor. Q. At the time you were struck did you hear any horn blown? A. No. Q. Where was the other bus or the truck that you say you saw there as you started across? A. Between this car and the curb. Q. What was its condition as to moving or stopped? A. It was stopped,—no other car that was moving except the one that hit me. Q. Did you notice whether or not that car started up or was coming down on that street? A. No, I could not tell that.

"Q. Mrs. Kerr, can you tell what part of that car struck you, if you know? A. Yes, because the mark of the fender was on my leg and is there yet. Q. Which fender? A. The front fender. The two marks of the front fender was on the side of my left leg. Q. How far were you thrown, if any? State what happened to you. A. Well, he hit me on this side. Q. You are indicating your low left leg? A. Yes. He went this way and I think that is when I broke my back. Then he threw me about six feet and I thought he was going to run over me but he stopped before he could. Q. Which way did it throw you? A. South. I didn't lose consciousness at all. I knew what was going on and I tried to get up but couldn't.

"Q. Did someone help you up? A. Yes some man ahead of me and he turned around and helped me up. Q. Which way was this man ahead of you going? A. The same way I was going. Q. On the crosswalk? A. Yes. . . . Q. Did

you ever see the car you collided with before the accident. A. No, not that I know of. Q. I mean at that time you didn't? A. I saw it coming at me. I was not able to get out of the way."

In saying that she was struck by the front fender, it is clear respondent meant the front bumper.

Appellant Levi Floyd testified that, as he approached Atlantic street from the north, the light turned green in his favor, and that he proceeded into the intersection without stopping. He admitted that the truck with the trailer referred to by respondent was at a standstill waiting for the light to turn; that a bus, headed north, was standing on the south side of Atlantic street. He stated, however, that, as he entered the intersection, respondent ran into the side of his car and struck the right rear fender. In this he was corroborated by a witness who testified that he had been standing on the northwest corner of the intersection when the respondent rushed past him and into the street, after the light had turned red against traffic on Atlantic street; that she proceeded in front of the standing truck and ran into the side of appellant's car. A policeman who was near the corner at the time testified that he had examined appellant's car and the

". . . only thing we could find on the right rear fender was the brush mark where a pedestrian some time had left a brush mark, scraping the right rear fender, but there were no dents."

██ Viewing the evidence as a whole, we have no hesitancy in saying that the trial court was fully warranted in holding that respondent had started across First avenue with the green light, notwithstanding the testimony of the man on the corner to the contrary. It was her word against his, and her word is corroborated by the fact that vehicular traffic was at a standstill on First avenue, and pedestrian traffic was moving across it.

██ Appellant's negligence is therefore clear, notwithstanding the light had turned green in his favor before he reached the intersection. For a pedestrian who enters an intersection with a green light has the right of way; and it

is the duty of an automobile driver to anticipate the presence of such a pedestrian and yield the right of way to him.

■ Appellants urge that, even though the pedestrian has the right of way, the duty to exercise reasonable care is still upon him; and that one who walks into the side of an automobile cannot be said to have exercised reasonable care. This proposition may be conceded. The trial court, however, found upon the evidence that respondent had been struck by the front bumper of the appellant's car; and we are not prepared to say that the evidence preponderates against the finding.

■ Appellants argue that the finding is contrary to the physical facts. The physical facts referred to are that the front bumper of appellant's car is seventeen inches from the ground and the mark on respondent's leg, as she stood, was twelve inches from the ground; and the distance from the ground "where the hind fender makes a straight corner behind the wheel . . . is thirteen inches off the ground."

We do not think these so-called physical facts are such as to overcome the sworn testimony of the respondent.

■ We do not think the damages awarded by the trial court are excessive.

That respondent was very severely injured, there is no doubt. She sustained injuries to her hand, which was in a cast for eleven weeks; also injuries to her back which required a body cast for two months and a brace for five months. She was in the hospital for fifty-four days and could not walk for a month after she was discharged. For treatment and hospitalization, she incurred expenses in excess of seven hundred dollars. She was still suffering from her injuries at the time of trial—a year after the accident. The surgeon who attended her said that she would "probably have some residual disability to the lumbar spine as well as to the right wrist joint region."

Judgment affirmed.

MILLARD, STEINERT, ROBINSON, JEFFERS, MALLERY, and CONNELLY, JJ., concur.

BEALS, C. J. (dissenting)—The only witness testifying concerning the accident on behalf of respondent was Mrs. Kerr herself. Her testimony on this phase of the case is summarized in the majority opinion.

Appellant Levi H. Floyd, J. Brozovich, and Richard Little testified concerning the accident on behalf of appellants. Appellant Levi Floyd's testimony is also summarized in the majority opinion. Mrs. Kerr and Mr. Floyd were, of course, interested witnesses. Mr. Brozovich, a member of the Seattle police force connected with the traffic division, testified that at the time of the accident he was about two hundred feet south of the intersection of Atlantic street and First avenue south, investigating another accident; that, when his attention was called to Mrs. Kerr's injury, he immediately went to the intersection. In response to a question as to whether or not he had examined Mr. Floyd's car, he testified that he had and stated the result of his examination as follows:

"A. There were not dents at all in any portion of the car. The only thing we could find on the right rear fender was the brush mark where a pedestrian sometime had left a brush mark, scraping the right rear fender, but there were no dents."

On cross-examination, the witness testified:

"You have no way of connecting up the so-called brush mark you saw at that time with this particular accident? You just saw the so-called brush mark? A. We examined the car to determine the point of impact and from the dust on the car,—none was brushed off the whole car but only on the right rear fender. Q. There was no sign of any impact anywhere on this car, as far as dents? A. No dents. Q. That is not particularly unusual when a pedestrian is struck by a car, a pedestrian being somewhat softer than an automobile? A. You will be surprised. I find there are dents on the fender and even on the hood when someone goes over the hood. Q. The brush marks were where? A. On the right rear fender. Q. On what side? A. On the side of the fender. Q. How high up? A. The fender was only that high and the brush marks were in about the middle of the fender. Q. The front of the wheel or the back? A. Over the wheel. Q. In other words, the brush marks would be at

about waist level, would they? (No answer) Q. Where were the brush marks on this motor? A. The fender really goes over the wheel there part way and the brush marks were around there. Q. It would be approximately at the top of the wheel if the wheel was not covered? A. Approximately, yes. Q. And in other words, the wheel mark, as you say, would be equivalent to the top of the wheel if the fender went over the wheel? A. That is right. Q. That would bring it how high on a person, to the hip? A. I doubt if that hip. Q. Just below the hip? A. Just below the engine. Q. Mr. Officer, did you see any marks which were as low as the calf of a woman's leg? A. Someone had moved her and sat her on the curb. Q. My question was did you see marks on the car in the way of brush marks as low as the calf of a woman's leg would be, which would be a foot off the ground? A. No, I don't think I did."

Mr. Little testified that he was "second steward of the United States Army Transport," working out of the Port of Embarkation; that he saw the accident from the corner of the intersection from which respondent left the curb. On direct examination, he testified as follows:

"A. I was walking from the main Port building. I came out the main gate and up the north side of Atlantic street. I had just passed the building line. The sidewalks are, I imagine, at least ten feet wide. I was just past the building line on the northwest corner and I looked up at the traffic lights, intending to catch the bus, and the lights were red. Q. Let me inquire, were you intending to cross First Avenue, South? A. I intended to, yes. Q. Did you see the plaintiff, the lady who was in the collision? A. Just about the same time I looked up and saw the lights go red the lady went by me. Q. Going in which direction? A. Going east across First Avenue toward that corner where she catches the bus there. Q. Mr. Little, can you tell the Court whether or not when this lady left the west curb of First Avenue, when she stepped into First Avenue South, whether the red light was against traffic cross First Avenue? A. I would say it was red. Q. Were you going across at that time? A. Yes, but I stopped because the light was red. THE COURT: Was she behind you or in front of you? A. She came past me just as I stopped when I looked at the light. Q. Why did you stop? A. Because the light was red and I didn't want to go across the street. Q. And when you stopped she came from behind you and came around you? A. Just about the same instant,

yes. Q. Was she walking or running? A. More than walking. I would not say she was running but at rather a trot or in a hurry.

"Q. Now, from the time she started across First Avenue tell the Judge what she did and what you saw. A. There are three lanes for traffic, one next the curb for parking cars and the second lane—there was a truck of some kind. I didn't get the name of it at the time or anything but there was a truck parked waiting for the light to go green on First Avenue for south-bound traffic. She stepped right in front of that truck and around on the other side of it. Mr. Floyd's car was in the third lane or the lane next to the center of the street and in my estimation—Mr. Levinson: Objection. Mr. McKelvy: Not what you estimate. Q. Did you see her collide with the car? A. I definitely saw her collide with the car, yes. Q. What part of the car and the lady came together? A. She hit the car on the right rear fender. It was the rear part of the car that stopped her and when it did it spun her around and to the pavement. Q. Where did the car stop, how far from the collision? A. Probably about the length of the car from the cross-walk. He was right under the center traffic light when his car totally stopped. Q. Was it rainy or dry? A. Dry. Q. Did you see the car sufficiently to give us any idea of its speed or not? A. I could not give the speed, Sir, because he came right up from behind the back of this truck. Q. You gave your name there, I suppose, to Mr. Floyd? A. Not to Mr. Floyd, no, but to the officers who were there. Q. Did you know Mrs. Kerr or Mr. Floyd or anyone involved in the accident before? A. Neither one. Q. You have no interest in the case then? A. None whatever."

On cross-examination, he testified as follows:

"Q. When you came up to the easterly curb, you were walking in an easterly direction when you came up to the curb of First Avenue, and you say you saw the signal change. How far from the curb were you at the time this lady passed you? A. She was probably two steps from the curb at the time she passed me. Q. That is just the time the signal changed? A. The same instant, yes. Q. When you were two steps from the curb how much of the sidewalk was still to your right? How far were you from the corner? A. I would say two-thirds of the sidewalk was to my right. Q. The cross-walk? A. I don't remember if the cross-walk is as wide as the sidewalk or not. That is quite a wide sidewalk

and I don't believe the cross-walk is as wide. Q. Was the same part of the cross-walk still to your left as you stood there, or as you approached the curb on First Avenue? A. Very little, if any. Q. Was there some part of it there? A moment ago you told me about two-thirds. I want to find out what part of the cross-walk, with reference to the north and south width, when you started to go across. A. I didn't start across. Q. When you were standing there. A. I was on the sidewalk and two-thirds of the sidewalk was to my right. Q. And about one-third of the cross-walk was to your left? A. If the cross-walk is as wide as the sidewalk, it was. Q. As a matter of fact, it is a little wider. That is a very busy intersection? A. It is a busy intersection. I could not say, I didn't measure it. Q. As a matter of fact, like most cross-walks, it goes up a little from the building line. It would be slightly north of the building line? A. I don't know. Q. Do you know whether this woman came out of the building at the corner of First Avenue and Atlantic Street or came along the same street you did? A. I don't know, Sir. Q. You don't know? A. No.

"Q. Now, however, there was a car, or a truck, which was parked waiting for the signal to change? A. That is right. Q. Had that truck started up when Mrs. Kerr walked across? A. No, he had not. Q. He was still standing there? A. If he was in motion he was just letting in the clutch. As far as I could see there was no forward motion to the truck. Q. Could you then see whether Mr. Floyd's car came up to the cross-walk and was stopped at the time the signal changed or whether he approached it from the north and went across with the change of the signal? A. I could not say because there was that truck. The truck was good-sized. Q. You could not see? A. I could not see. I could not say whether he was standing or moving. Q. Now, in that particular corner, or with that signal, there is an appreciable change when the signal is red both ways, an appreciable time? It might be a second or two? A. Some, I don't know how much. Q. At the time Mrs. Kerr was struck had the signal completely changed to green on the north-south direction? A. Well, that is pretty hard to say. I was not looking up because I knew the moment she stepped into the street— Q. Don't tell what you felt but to your best recollection, had the signal changed to green? Was there enough time for it to change? A. I would say there was. I would not say positively it had changed. Q. How many steps, or how far had Mrs. Kerr gone before she came into contact with the

car? A. She had gone the width of those two lanes, which is about seven feet or so to each lane. Q. You say she stepped into the street just as the signal changed? A. No, I don't believe she even got to step into the street before the signal changed. Q. You mean she was just on her way? A. On her way. Q. Because you were only two steps from there yourself? A. Right. Q. And she was going faster than you? A. Faster than I and I knew that I was not going to make it.

"Q. What part of the car struck Mrs. Kerr? A. The right rear fender. Q. How high up, what part of the fender? A. It was on the side. Q. Let's get the Judge's little automobile. A. I would say right in there. Q. At the top? A. The top of the fender is where it struck her but on Mr. Floyd's car the fender is slided down her. This was bent out. Q. Did you examine it for that? A. Well, it was very plain to see. I didn't have any business to examine it. Q. As she was hit you say she was tossed backwards? A. Not tossed but spun. She spun right around and on the pavement. Q. Where was she lying when it was over? A. Some other fellow picked her up right there because you are not supposed to pick them up. She was lying in the center lane, or maybe between the second and third lane. Q. Where did the two men come from who picked her up? A. A couple soldiers picked her up. Q. Where did they come from? A. I think from the curb, one from one side and the other from the other side. Q. Was there anyone ahead of her at the time? A. There had been other people going ahead of us. It is a pretty busy corner at that time of night. Q. How many were ahead of her, about? A. That would be a pretty rough estimate. They cross that street there all the time. Q. It was four o'clock and everyone was coming out of the Port of Embarkation Building. There are a good many thousands of people who change shifts at that time? A. Yes. Q. And at that time there is a lot of cross traffic, pedestrian traffic? A. Yes. Q. And you cannot tell how near the person immediately ahead of Mrs. Kerr was? A. No."

In his oral summation of the evidence at the close of the case, the court, *inter alia,* stated:

"Now, I believe firmly in this case that she was hit by the front bumper. I am perfectly satisfied it was the front bumper from the way it happened, on the place where it struck her on the leg. I am going to assume that as a fact because I cannot get that out of my mind. I realize that

there was testimony here to the effect that there had been some rubbing on the side of the fender. The officer said that and he had no occasion to falsify. Another witness said that and he had no occasion to falsify. That car had been standing there for a little while. There had been an accident there. There were people there. That so-called brushed appearance on that side of the fender could have been occasioned by various things. MR. McKELVY: May I interrupt? Perhaps you have forgotten Mr. Little testified he watched this woman and saw her run directly into— THE COURT: I am going to get to that. That could account for some of that so-called brushing.

"Now, I come to the testimony of Mr. Little that he saw her run directly into the side, and that was corroborated by the defendant. I am satisfied, notwithstanding the sincerity of Mr. Little, and I think his intention was an endeavor to tell the Court the truth,—I am satisfied he was wrong there and that didn't happen by her running into the side of the car. He saw wrong or else he drew a wrong conclusion from what he saw. I am satisfied this woman was knocked down by being struck by this oncoming car with the front bumper. So, Mr. Little was seeing something there or thought he saw something that he didn't see. I am satisfied that didn't occur that way. If it had this case would go out right now. But Mr. Little, like all other honest people and disinterested people, can be deceived by appearances. . . . I cannot change my mind about his [appellant's] negligence. The only question is the negligence of the woman. I don't think Mr. Little was dishonest. He was trying to tell it as he saw it but he was certainly mistaken when he said this woman went right on and hit the side of this oncoming car. The border line was very close. She had started across there and she had gotten two-thirds or more than two-thirds across that side of the street when she was hit by this oncoming car. Although I have no doubt she saw some signs indicating a very near change of lights and she kept right on, I cannot change my mind in finding and my belief that this defendant was guilty of negligence, Mr. McKelvy."

Later in his summation the court said:

"MR. McKELVY: You don't find she went into the street with the green light? THE COURT: I don't find she lied. She said she did. The disinterested witness and the defendant himself are both mistaken.

"Since you asked a question, this woman had been doing

that right along, every day, every day doing the same thing. Now, on this day it appears the woman had the green light in her favor or she would not have gone in. Mr. Little was not in a hurry—"

At this point the court was interrupted by counsel, but later stated that, in his opinion, Mr. Floyd went against the green light.

Neither the testimony of Mr. Brozovich nor of Mr. Little was anywise impeached. The former, of course, testified merely to the fact that he observed a "brush mark" on the right rear fender, which, according to witness Little, was the portion of the car with which respondent collided. As above quoted, the trial court stated that he did not think the witness Little was dishonest, but had tried to describe the accident as he saw it; the court simply concluding that Mr. Little was mistaken.

Mr. Little, standing at the corner, occupied a perfect position to observe what happened. He testified positively that respondent stepped from the westerly curb against the red light; that he, Little, desired to cross the street, but stopped at the curb because the traffic signal was showing red against him; that respondent passed him and, walking rapidly, entered the portion of the intersection used by vehicular traffic. There was nothing to interfere with Mr. Little's view of subsequent events. He testified positively that respondent walked into the side of appellant Floyd's car.

Officer Brozovich observed a "brush mark" on the side of the car at approximately the point Mr. Little said respondent and the car collided.

The court stated that Mr. Little, while an honest witness (and certainly he was a completely disinterested one), was mistaken. If so, he must have been mistaken on two matters: first, that respondent stepped on the pavement against the red light; and, second, that she collided with the side of the car. The court found that appellant Floyd was negligent in several particulars; that respondent had proceeded across First avenue south with the traffic signal in her favor and was not contributorily negligent. The trial court did not

make any finding concerning the portion of appellant's car with which respondent collided.

As above noted, the trial court stated that, if respondent collided with the side of appellant's car, she was guilty of contributory negligence.

In my opinion, the evidence preponderates against the court's finding that respondent entered the paved portion of the highway with the traffic light green.

I am also convinced that the preponderance of the evidence shows that respondent collided with the right side of appellant's car and was not struck by the front bumper.

The judgment appealed from should be reversed, and the action dismissed.

SIMPSON, J., concurs with BEALS, C. J.

[1]Reported in 169 P. (2d) 356.